Mr. Caldwell for Petitioner, S.F.P.P. L.P., Mr. Edinger for the Respondent, Mr. Wagner for Schieffer Petitioner, Mr. Edinger for the Respondent. Mr. Caldwell, we're here for you. Good morning. Good morning, Your Honors. Good morning. May it please the Court, Charles Caldwell, Counsel for S.F.P.P. L.P. and appearing on behalf of them for argument. S.F.P.P. seeks review by the Court of FERC's erroneous rulings on three issues in its Westline rate case. First, FERC has eliminated S.F.P.P.'s income tax allowance on the basis of a presumed double recovery of tax costs. That presumption is not supported by the record and is contradicted by FERC's approach to deriving the equity return, the so-called discounted cash flow or DCF method. It is based on the theory that efficient markets will price into a pipeline's equity return all public information, including tax status, tax circumstances. Second, the Commissioner refused to reopen that rate case record. FERC assured such opportunities to all oil and gas pipelines, yet afforded no such opportunity to S.F.P.P. Moreover, as it stands, it's important to recognize that the underlying Westline rate case record actually contradicts FERC's double recovery presumption reflected in the revised policy and applied to S.F.P.P. and Opinion 511C. In the underlying rate case record, the shippers put on a case claiming that partnership pipelines would earn excessive returns compared to corporate pipelines if afforded the tax allowance, thereby evidencing the so-called double recovery of tax costs. S.F.P.P. rebutted that with testimony. The administrative law judge below reviewed that record and issued an initial decision that rejected the shippers' claims, found that there was not a double recovery where S.F.P.P. was afforded an income tax allowance. That's the record below as it stands. It hasn't been modified below by the Commission. It hasn't been reopened, and I would say that that record supports remand. Third, the third issue, FERC has arbitrarily altered its established so-called indexing forward practice in setting S.F.P.P.'s Westline rates and determining the refund to those. That was a practice that's been in place for some time and was upheld by this court in D.P. West Coast Products v. FERC. As revised here, the order is under review, FERC's approach limits S.F.P.P.'s rates over the period that is subject to the rate case to no more than the level of inflation, even when S.F.P.P.'s costs may in any given time period support higher rate levels. But on the flip side, the Commission's revised approach opens the door to S.F.P.P.'s rates being set lower even than inflation would afford, and that's not reasonable. Starting with the tax allowance area, FERC has acknowledged on brief that its outcome in this area has to have adequate support in the record. Yet, whatever one thinks of the double recovery assumption that FERC makes, it is contradicted by the record, both over in the revised policy statement docket and in S.F.P.P.'s rate case. And that, in this situation, warrants remand. Having been remanded by the court, the United Court, for failure to justify its previous policy, FERC has failed again here to properly develop and address the record on the double recovery issue in S.F.P.P.'s rate case. Moreover, as is, as I noted previously, the rate case record did address double recovery. and ruled that they supported the conclusion that there was double recovery and gave FERC an opportunity on remand if it so desired to justify why it wasn't. And FERC has concluded that they're not seeking to, I guess, rebut that presumed conclusion that we had in United. So it doesn't seem like here we have a situation where FERC's obligation for either action or explanation on remand is the same as it would have been prior to the United Airlines case. Why is that not the correct way to look at this? Yes, Your Honor. Well, I'll take those as best in order. I hesitate, as I think, naturally, to tell the judges of the court what it meant in a previous opinion. But from my reading, to the best of my ability, of the United opinion, I would say it's a fair characterization of it that it didn't, so to speak, render on this issue. What it found, by my reading, is that the Commission failed to provide a sufficient justification for its position at that time under the 2005 policy that providing a tax allowance to a partnership pipeline such as SFPP did not result in a double recovery. And that's different, I would say, from a holding by the court that, in fact, it did. And I can parse the United opinion further in that regard if that would be at all helpful. But I think there's a number of instances that evidence that, but that's obviously my interpretation. As to the question of the various, as you noted, and as I see in the opinion, various points the court took as uncontested, I would – I read those as being – because at that point the argument was between the Commission and the shipper petitioners, I believe the court was indicating that the Commission and the shipper petitioners didn't have a dispute about that, that didn't encompass SFPP. At that point, SFPP believed that the Commission's 2005 policy, still believes, was the reasonable and correct approach to resolve that issue. And my last point that I would offer is that upon remand, unless the court's rendered, I believe it's the duty of the Commission to fully evaluate and whatever outcome it arrives at under the applicable review standards, it has to support what it's doing with substantial evidence. And in this instance, based on the matters noted on brief and that I've highlighted, I don't believe the Commission has that support. The underlying record, which the Commission refused to reopen in light of its revision and policy, the underlying record, as noted, fully litigated. The Commission notes that multiple times, both in the orders and on brief, that SFPP's fully litigated this in the rate case below. And when you go and look at that rate case record, which the Commission also indicated that it had reviewed in the process of the remand from United, it went back and looked at that record, and the Commission's characterized itself as, we are satisfied that supports changing our policy and removing the tax allowance for SFPP and everybody else who's a partnership pipeline. And I would just submit that that's not consistent with the record below. The record below, up through the initial decision of the administrative law judge, fully litigated, as the Commission has noted, supported a finding that affording a tax allowance to SFPP did not generate a double recovery. So the Commission may have, well, in fact, has changed its mind about what its policy is, but it didn't change the facts below in the record. In order to address... Sorry, Your Honor. This is Judge Rogers. Following up on Judge Wilkins' point, the Commission, as I understand one of its points, is it fundamentally disagrees with your client's position with regard to the use of the discounted cash flow methodology. So to the extent on remand, the Commission explains how it views the effect of the discounted cash flow methodology. Why isn't that a sufficient response to the remand? In other words, you're suggesting that we needed an evidentiary hearing on remand. And what I'm trying to understand is the Commission explains how it views a particular methodology and the effect of that. And I understand you disagree with that, but that is the Commission's explanation, at least part of it, isn't it? I would agree with that, Your Honor. But I would say that two things. One, as noted, it's not supported by the Commission. The Commission assembled an evidentiary record below in SFPP's rate case, and that record is inconsistent with what the Commission says is its outcome now. So that's one thing. And as to what it says is its position as to the working of that model, the Commission has adopted, and I'm just noting things from our brief in that regard, the Commission's really contradicted itself. The Commission says that it believes that the working of the discounted cash flow model for determining equity return takes cognizance that the market, basically, which is reflected through the pricing of securities that's plugged into that model, that the market indicates and recognizes the tax circumstances around any investment in whatever company is involved that owns Pipeline. And that because of that, it would affect and recognize whether or not, in the case of SFPP, it was afforded the tax allowance or not. The Commission says that's not correct, that the output of the DCF, sorry for the acronyms, model is inherently inclusive of SFPP's income tax costs or the investors in SFPP's income tax costs. And so that providing income tax allowance, I mean, this really is the heart of their point, recovers those costs twice, when it's in the income tax allowance and then because it's inherently and unavoidably in the DCF. And what I would submit is the Commission is stating something that conflicts with the working of this efficient market theory that it espouses, because the DCF output is, in fact, it's not a mechanical process. It's not as if the Commission goes in and puts the tax cost recovery into the DCF. That is the result of the market inputs into it. How much cash flow is there? What is the pricing of the security? What's the growth factor? Those produce the rate of return on equity that's then applied to the rate base and generates the DCF equity return. And if the pricing is reflective of whether or not the entity gets the tax allowance, that should, as a matter of math, change the rate of return, that's the formula, and adjust the equity return to recognize that. So there wouldn't be a double recovery. I mean, I can give a simplistic example, but I don't want – I realize I've talked for a while, and I don't want to – that's how I would respond to your question, Your Honor. And I would add – and I just add one other thing, and it's somewhat, I believe, responsive, further to Judge Wilkin, is there's more to SFPP's remand issues. I mean, that's a fundamental one, what we've been talking about. But there are other issues. One of them, which was noted on brief, was noted to the commission, the commission has chosen to do nothing about it, is that there are other problems, one of which is the equity return that is currently in place in this rate case and is the one upon which SFPP is required to pay and reset its rate, was based on the prior period. It was based on a circumstance in which the companies that are reflected in the proxy group that used to derive that equity return were MLPs, were partnership-owned pipeline companies, that were afforded a tax allowance. The affording of the tax allowance would have affected their pricing and affected the output of the DCF model for SFPP. And therefore, the commission, having ordered SFPP to eliminate its tax allowance, which it has in its compliance filing, has, however, saddled it with a return that was calculated from a proxy group that assumed the tax allowance would be provided to these types of entities. And therefore, the rate of return on equity, at a minimum, a remand is necessary because the rate of return on equity is mismatched with the elimination of the income tax allowance under the wave – I'm sorry. Can you just explain to me – so just ignore the record for a second. I know you don't want to do that understandably, but just – if you just disregard the record, just as a matter of conceptual theory, how is it that there's not a double recovery in this circumstance, as Burke has laid out? Because it just seems to me, as a matter of basic understanding of the way this functions, there is a double recovery when there's an income tax allowance because the return on equity takes account of the tax allowance as a pre-tax matter. And then you're going to have a necessary effect on distributions, too, if there is an income tax allowance because distributions will go up. So I just don't understand, as a theoretical matter, how there's not a double recovery. I understand, Your Honor. And I understand the point about, yes, there's more than one thing moving in the DCF formula. What I would say is that, first, this is – the question you have gone to, which is a central one, is something upon which expert testimony was taken in the underlying rate case. It was also provided to the commission in the public inquiry process that led to the revised policy statement. And experts lined up on both sides of these types of questions. Empirical evidence was adduced about this. So it is certainly one where you're not off in no man's land by saying, well, it looks like this could be this case. It could be the other way. There are rational minds that have evaluated it in different ways. And that is precisely the type of question that the commission could have reopened the rate case record and taken cognizance of. So, yes, I emphasize the record as it stands. I think it's relevant to why a remand is necessary. Not because I'm asking you to render a determination that the commission has it wrong. I think they do. My client thinks they do. But rather, that's the reason why. Because there are clear, strong, differing views on this exact question, that a remand is appropriate because the commission should have reopened the record because this is the type of question upon which factual evidence can be adduced. People can be put on the stand. Evaluations can be done. And then, rather than these types of arguments, if the matter comes back to the court, it will be with a fully developed record. As it is, the commission has parts of a record, and it's largely relying on choosing one rather than the other. It ignores factual disputes that were propped up in the public inquiry process. And it's ignoring the fact that the underlying record goes the opposite way after one of the commission's administrative law judges heard everything, went through exactly an analysis around this same point. The shippers attempted to show that there was an excessive return for partnership pipelines, and that caused a double recovery. I also suspect I'm running way into my time at this point. And I apologize for that, Your Honor. That's how I would respond to Your Honor's question, is that rather than asking the court to determine the merits, the key point we're making is that a remand is appropriate because the commission failed to reopen the record. Which it had promised to all of the other pipelines out there. And yet, the pipeline from whom the rate case from which this all arose is not permitted to develop the record. And I will stop at that point, Your Honor. Thank you, counsel. If my colleagues don't have any further questions for you, we'll give you your rebuttal time, and we'll hear from Mr. Edgar. Thank you. Good morning, and may it please support. I'm Scott Edgar. I'm with the Federal Energy Regulatory Commission. The discounted cash flow methodology determines a pre-tax return that covers the investor's tax costs. Nothing more is needed, and anything more than that is a double recovery. There are multiple flaws with the pipeline theory in this case, that investors somehow do not demand a pre-tax return when the entity receives an income tax allowance in its cost of service. The commission's analysis in this case, reasoning is set forth in the remand order in paragraph 22, which is at JA-884. The commission here largely follows a line of reasoning that was set out by the court, this court, and United Airlines at 827F3, page 137. The commission begins with the undisputed point that a master limited partnership itself as an entity has no tax liability. The commission moves on to the observation that the discounted cash flow methodology provides a return that is necessary to attract capital. The third bullet in that paragraph becomes more critical, and this is an important part, and this is critical to the commission's reasoning that, as I've just said, the model must provide a return to attract capital. The third bullet point refines that a bit and says to attract that capital, that return must be sufficient to cover the investor's tax responsibility liability. This is largely a finding made by the court and United Airlines as well, and in support, the court there cited paragraph 243 and 244 of opinion number 511. This is at JA pages 405 to 406. The commission as well cited this hypothetical in its orders at, in the remand order at page 16, footnote 32, at joint appendix 332, and opinion, or in the remand rehearing order, paragraph 11, footnote 26, JA 1274. This hypothetical, Your Honor, was critical to the court and United Airlines, and it was a critical piece of the commission's reasoning here. It demonstrates that as distributions go up or distributions go down, there is, in tandem, a change in the price of the unit. Indeed, we have seen that happen in this case. When the commission issued its orders resolving this issue, we have certainly seen a market response. But the point the commission is making in these paragraphs is that irrespective of these increases or decreases in the distributions, the return on equity remains stable. In other words, it remains pre-tax with or without an income tax allowance. The question, Mr. Attagib, it's just for you, Lawson. So if it's this clear that there is a double recovery now, then was it this clear that the commission was wrong in its resolution immediately before this one? The commission certainly didn't prevail in United Airlines. The commission took the position that before United Airlines, this kind of cash flow model determined an after-tax return. And the commission said that here in the remand order, paragraph 14, that's at JA 881. And I can't speak, Your Honor, to the reasoning in that. I'm not here to defend those orders. Again, the commission clearly didn't prevail in that case. United Airlines remanded the case, and the commission has taken what I believe to be a very thoughtful and careful reevaluation of this issue and has looked at some of the fundamental principles of the discounted cash flow. And this gets back to the paragraphs 243 and 244 of Opinion 511 and has reached the conclusion that the model determines a pre-tax component of the return that is sufficient to cover the investor's tax costs. Since we are talking about an entity that itself doesn't have a tax liability, it is a pass-through entity, if we add anything before the discounted cash flow observed return, then that results in a double recovery. And can I ask, how would you respond to the argument on the other side that whatever one might think of this as a conceptual matter, that the record wasn't adequately borne out on remand? I would very much disagree with that. This is a litigation that has been going on for a very long time, for 12 years. SFPP has been fighting this battle for 12 years to retain its income tax allowance, and it has made an adequate record throughout this time. In addition, SFPP was able to file comments and supplemental comments following this court's remand. SFPP filed a rehearing request. In addition, SFPP filed a motion to reopen the record, which attached substantial materials that it had filed in the policy statement case, in addition to a new affidavit by its expert, Mr. Webb. I want to make the very important point here, Your Honor, that with regard to the motion to reopen, the Commission denied that motion, but the Commission considered the information attached to the motion. For all intents and purposes, the Commission did open this record and did consider everything that SFPP filed. This is at paragraph 36 at JA1289 and paragraph 26, JA1282. It just isn't the case that SFPP has in any way been denied the ability to advance it, to make a record. It just isn't true. I also would like to make a few observations about the ExxonMobil case that SFPP relies on to justify the income tax allowance here. The court in that case found that a pass-through entity may recover its income tax expenses that are related to regulated assets, and the Commission doesn't dispute that here. Moreover, if the Commission has a reasoned basis for including the income tax allowance, that's permissible. Importantly, the court there explicitly left open the possibility that it would be permissible to disallow the income tax allowance and set returns on a pre-tax basis. I'd submit, Your Honors, that that is exactly what the Commission has done here. When United Airlines was decided following that, it took those points and essentially said, yes, we agree with that, but we didn't say that the Commission could allow recovery twice. In the context of United Airlines, in the context of the discounted cash flow methodology, that's where the double recovery issue arose. It did not come up in ExxonMobil. Finally, I would like to emphasize a couple points about the first case in the series of cases dealing with this issue. In BP West Coast, it's important, Your Honors, that we remember SFPP petitioned in that case asking for 100% income tax allowance, whereas the Commission had only allowed a partial allowance. The court in that case found these arguments, quote, not well taken, end quote, and they found the shippers' arguments against them convincing and consistent with rate-making principles, and this is at 374 F. 3rd, 1288. And the last point that they made, although they didn't follow up, this is Judge Rogers. I'm sorry? Counsel for SFPP made three arguments, and it's pretty arbitrary, altered the indexing that this court had previously held. Yes, the Commission addressed the indexing issue, and this is, of course, this rate case is for rates that are beginning in 2008. The indexing years that question here are 2011, 12, and 13, and what the Commission did in its order on remand is to deny SFPP's request to retroactively change its indexing request that it had filed in each of those years. And the Commission addressed this argument at paragraph 57 of the remand order at JA 902, and the Commission referred to its reasoning in the opinion number 522B. And it gave five reasons why the retroactive indexing increases shouldn't be permitted, and the first of those is that the rate case determinations that are made in this case, that we're talking about in this case, for example, the income tax allowance and whatnot, that that decision didn't affect the questions that arise in an indexing proceeding, i.e., it didn't change the industry-wide cost change or SFPP's particular change in cost for that particular given indexing year. The Commission also found, and this is in opinion number 522B, that allowing SFPP to make these retroactive indexing changes would inoculate SFPP from its indexing choices. The Commission also found that the retroactive indexing changes would thwart the simplified and streamlined system of the indexing regime. In particular, on this point, Your Honor, the shippers, for example, would have to, if the shippers were to protest any given indexing year, they would have to do so in the indexing proceeding, and they would have to turn around and relitigate, refight that battle here. The Commission is basically making the observation that that is contrary to the indexing regime that the Commission designed following the passage of the 1992 Act. And the Commission also found that the retroactive indexing changes would violate the rules of indexing that the Commission has passed, in particular, 18 CFR, in part, Section 341.2. And finally, and some of these are intertwined, admittedly, that the retroactive indexing changes would undermine predictability and rate certainty. If Your Honors don't have any additional questions, I would respectfully conclude there. Thank you, Mr. Edgar. If my colleagues don't have further questions, then we'll give Mr. Caldwell his rebuttal on these issues before we turn to the shipper petitioner issues. Thank you, Your Honor. I appreciate that consideration, and I will keep my response brief. There were a couple of items that I would like to respond to, as solicitors noted. As to the comment, and here we're talking about the tax allowance issue, the comment about the length of litigation that went on for years and years and years, and SFPP's had its full opportunity. Yes, the litigation has been pending for a very long time, but the Commission's position on the tax allowance did not, was clearly that there was, that the tax allowance was warranted for SFPP up until the moment in March 2018, just a scant two years ago, that the Commission decided to go the other way and changed its policy and simultaneously, and without any opportunity for SFPP to build any record on this, in this case, applied that. It's ironic to be chastised for having litigated so long when, in fact, this issue was very settled for a very long time the other direction. Also, as to the observation that SFPP had its full chance to address this and all that litigation, we'll take that at face value. And back to my point, Your Honors, that in that whole litigation, a record was made. It was tenaciously litigated between the shippers and SFPP over this very question of double recovery. And the ALJ reviewed that record and found the shippers had failed to demonstrate a double recovery. So I think it's important to recognize that, and yet, the Commission has failed to engage with that, failed to look beyond comments filed in a proceeding in which there's no adversarial process, there's no testing, there's no putting experts on the stand, that instead, that fully litigated in front of a trier of facts process is now trumped by a series of rounds of comments, not disparaging the comments, but the comments themselves in the public inquiry process were disputed, dealt with different factual analyses. The Commission didn't attempt to resolve them. If you look at what they've said in the policy statement, the revised policy statement, they again and again observed that, well, they basically are taking what the Court of the United said as part. But the Commission says when you file your motion, you attach the number of documents, including a new declaration by your expert, and the Commission considered all that and then did not find it persuasive. What's your response there? Yes, Your Honor. That was the motion to reopen, and that was SFPD's attempt to appropriately give a proffer of what it would attempt to show. Among the things it would attempt to show, if given the opportunity, I would, one, submit it would be a doubtful outcome to say that because the litigant has attempted in good faith to try and identify areas that it would further seek to develop by providing materials. I mean, that wasn't the only, those were not the only things noted. Among the things noted were that you've got to reopen the record at a minimum in the rate case because of the mismatched ROE. The ROE SFPD has been saddled with was based on an assumption that there would be a tax allowance, and that inherently, arguably, again, a point that can be argued and facts could be adduced upon, left SFPD with an understated equity return and no tax allowance, and therefore was forced to overpay refunds and set its rates unreasonably low. Those are the types of issues that could have been developed if the commission had chosen to reopen, to attempt to say, well, you made a proffer, and we're going to turn around and try and dispatch that rather than give you an opportunity to make that showing, have the opposing parties put forward their witnesses, that that somehow was a basis on which to leave the record as it was. So help me out here, counsel. In the next rate proceeding, would not your client have the opportunity to present evidence to show what it styles as its entitlement? Yes, your honor. I believe you're referring to me. There is a there's been reference to there is the, the East line SFPD East line rate case, which is pending before the commission and on rehearing. And yes, the tax allowance issue has been litigated there as well. I would say the difficulty is your honor that I'll just pose that I believe it may be challenging if the Westline rate case is finally resolved. How can, if in a later rate case, this gets resolved the other way, and SFPD has paid all of its refunds, it's been charging rates that are ultimately now found to have been set too low because we get a different outcome in a later rate case, where do we go to get relief? The, I would say, I would submit that it's appropriate that relief the kicking it down the road would not help at all with regard to SFPD Westline rates, refunds and the harm that's already been done to the carrier. And I believe I'm out of time and I appreciate the court's indulgence. I have a question. This is judge Wilkins before you before you in your rebuttal. Yes, your honor. Can you can you direct me to where in your, in your opening brief. You discuss the findings about there being no recovery. Your honor, we did not delve into the specifics of the, the ALJs finding those were actually there in the joint appendix the reference in opinion 511 in, in some detail. We, we delved into it because the shippers and the commission brought up the commission brought up that they had looked at the record below and they concluded that supported the double recovery finding that's simply inconsistent with the record below. And what the commission itself said in opinion 511, and I can, if it would be of assistance, I can provide citations. I could, I could, I could give you a twenty H. A, or, or I can rifle around in the joint appendix, which is spread out on my desk and find those references in opinion 511. And then in the initial decision, where that was all dealt with as a BP brought that up in response to the arguments that the commission may that they had already looked at the entirety of the record and it supported their finding of a double recovery. We're merely pointed out that in opinion 511, and in the initial decision in the Westline rate case, the commission, well, it's administrative law judge thought otherwise and that the commission seemed to be ignoring that. Wasn't opinion 511 the subject of the United Airlines case? Yes, your honor. All right, I don't need any supplemental briefing. Thank you. Yes, your honor. Thank you. If there are no further questions, thank you. Thank you. Your honor. Thank you. Mr. call. Well, why don't we shift over to the shipper claims? Mr. Wagner. Good morning, Gregory Wagner for the shipper petitioners and I'd like to use my time to address the deferred tax issues. Kirk has a consistent policy of requiring pipelines to reconcile overfunded aided in rates, but it exempted from that policy on the grounds that applying the policy in this case would be retroactive rate making and therefore unlawful. But the relief we're seeking is no more retroactive than any other reconciliation of overfunded aided. And if what we're seeking is unlawful, then so is every other instance of tax normalization and aided reconciliation. Now, there's only one exception to the requirement to reconcile overfunded aided. And that's where FERC has lost jurisdiction over the rates that gave rise to that balance. That's the CPC case. This issue of deferred taxes arose because FERC allows pipelines to collect the tax allowance to pay its current taxes and also to reserve an amount for future taxes. That reserve is set aside, is deducted from the rate base so that the pipeline doesn't earn a return on cost-free capital that was not contributed by the pipeline's investors. And that's a critical element to the tax normalization policy. The balance, it's not just an amount that's earmarked for future tax liabilities. It's also an accounting of funds that the pipeline is prohibited from earning a return on. So when pipelines set new rates, they reconcile the balance of that reserve to ensure that it's calibrated to recover the amount of the projected future taxes. If the balance is overfunded, the pipeline amortizes a portion of that balance each year as a reduction in the cost of service. And concurrently with that, it adds that amount back into the rate base so it can gradually begin earning a return on those funds. This is not controversial. It's not retroactive rate-making. It's a staple of pipeline and utility rate-making for going on four decades. SFPP's aided balance, in this case, is fully overfunded because it no longer anticipates requiring any revenues to pay future taxes aside from those that are being recovered through the return on equity. Can I ask you, before we go too far down the road, can you address the public utility decision that we have, and in particular, if you take the language in that decision as operative, is there a distinction between what was covered in that language and what you're arguing here? Yes, there's absolutely a distinction. And by operative, may I ask, do you mean that none of the case is DICTA and that it is a binding precedent? Yeah, exactly. So I know you've got an argument that it is DICTA, and I take that argument. Just for present purposes, I'm just assuming that the language that addresses the analogous issue there would be binding on us, and I'm just asking you to address that language. Thank you. Understood. So in that case, it arose under unique circumstances that aren't present here. So the pipeline had an overfunded aided balance that was related to gas sales service, but because Congress had stepped in by passing the Natural Gas Policy Act, FERC no longer had jurisdiction to regulate the gas sales rate, so it had no gas sales service in which to reconcile the overfunded balance. The only other rates that were left under FERC's jurisdiction were the pipeline's transportation rates, and the court held that it would be inappropriate for transportation customers to receive a credit that was related to a different service. In the language that we're discussing that we're assuming for purposes of the question is operative, it says that if FERC meant to provide a remedy based on a finding that the rates were too high in the past, that would be unlawful retroactive rate making. That's not really a unique holding. That is the law. If the agency is trying to provide a remedy saying that the rates are too high after further consideration, then that's unlawful. But what the court didn't hold in that case is anything that's binding or that is under the facts of this case. It didn't hold that it's unlawful retroactive rate making for FERC to reconcile overfunded aided where the FERC retains jurisdiction over the service at issue. Again, that's exactly the case here. So that decision doesn't dictate the results here. I'd like to just sort of cite a few passages from the decision if I could to kind of buttress what I'm saying. There's a discussion on page 1379 that says the fundamental difficulty with what FERC is doing with the credit of the fund's earnings is that it's not attached to, derived from, or related to any service that the pipeline provides or has provided in the period after the switch to NGPA ceiling pricing. So the fundamental difficulty is that there's no regulated sales service to hook it to. It says if the rate El Paso is passing on to customers is a lawful rate under the NGPA, the commission is powerless to reduce it. Again, FERC has to be hands-off in that unique case on regulating the service that gave rise to the balance. It says that neither the court nor the commission can embark anew on the cost-based analysis that Congress sought to avoid through passage of the NGPA. Congress stepped in, took jurisdiction. There's no such thing here. And then as far as where FERC tried to go into the transportation rates, it said the commission cannot simply lop money out of a commission's, I'm sorry, out of a company's jurisdictional rate base in order to dole out a credit intended to solve some problem extraneous to the rate base. Our problem is not extraneous to the rate base. It's central to the rate base, and the commission continues to regulate the rates that are calculated under that rate base. This is Judge Wilkins. But isn't the FERC's point that it is extraneous to the rate base to the extent that you are seeking to recover accumulated tax payments, deferred tax payments that were before 2008, which is the applicable time period for this rate case? Yes, we're trying to do that. We believe FERC is incorrect in that. What we're trying to do is apply the traditional remedy. Every time aided is overfunded, that overfunding arose prior to the effective date of the rates in the case that's being litigated. So if I could just make an analogy to something that FERC recently did in light of the 2017 tax cuts and why I think that FERC is treating these situations differently. In 2017, Congress cut corporate tax rates from 35% to 21%. And pipelines had previously collected a tax allowance in anticipation of incurring that 35% tax rate in perpetuity. But once there was a change and those rates were still collected and that money was banked in the aided balance prior to the present period, it became overfunded. And another way to think of that is that those pipelines had a head start on collecting for now what turns out to be 21% taxes in the future. So there's been a change in the circumstances, not as an error that needs to be fixed, but a change in the circumstances. So the way FERC handled that is it accounts for that head start and that change in circumstances by requiring the pipelines to effectively collect less than the 21% going forward. If what FERC has ordered in our case were applied in the case of the tax cut, what they would do is say, up until the tax cut was effective, pipelines collect 35%. After the tax cut is effective, pipelines collect 21%. That would do away with the normalization entirely, which is exactly what FERC has done here. It did away with the normalization, pretended it wasn't operative. So what I'd like to do also is explain an issue that FERC sort of cast to the side and did not even address was the fact that SFPP eliminated its entire balance back to 1992. And the mechanics of that are somewhat complex. They can be seen in the record at JA804 through 806 and compare that to JA958 to 959. You can see how the calculations were done while there was a tax allowance and while there was no tax allowance. The upshot is that it allowed SFPP to earn a return on about $28 million of what's supposed to be cost-free capital. There's no justification for why something that has always been set aside as cost-free capital, it's not raised from investors, but FERC just said, well, in this case, they're allowed to keep it. This had an effect, a retroactive rate-making effect that FERC refused to deal with other than to say that it, you know, that this summarily rejected in paragraph 101 of this order. We explained in detail how SFPP increased what's called the deferred equity return account. That leads to higher rates than would have been in place if it had properly reconciled the balance or even if it had eliminated it as of 2008. That's on JA1048. We have a graph from our expert witness on that. JA797 and 951, those are cost of service schedules, and you can compare the numbers on line eight, which shows the math behind all that. I believe I've made my points about the retroactive rate-making. One actual last thing that I wanted to say on retroactive rate-making is that in FERC's brief on page 52, they state that the shippers did not explicitly link the increased deferred return to a violation of the rule against retroactive rate-making. That's wrong. We did so expressly at JA1243 through 1244 in a section of our server reply comment. We also laid it out in detail in earlier pleadings, but expressly termed it retroactive rate-making at those pages. Can I ask just one question before you move on? Hypothetically, if you were to prevail on this issue, how do you envision the remedy working out? You've got aided funds that are in reserve, and then they would be distributed to shippers. How is the allocation determined? Okay. First of all, we have a detailed proposal on that. It's at JA1024 through 1056, but I could briefly explain, and this actually also shows why this is not retroactive rate-making, why it's not a claim of ownership on the balance either. The shippers in the past that paid the rates that gave rise to the overfunded balance would not receive a one-for-one credit. If I'm a shipper who shipped on the SFPP pipeline in the year 2005 and never again, I would see no relief from this. This is not a claim of right for damages in the past. What we would do is institute a negative surcharge, is what we called it. It would mimic the amortization of the overfunded balance by amortizing it over the period of this rate case, which now, as we've all discussed, has been well over a decade. It would simultaneously fold back in. Every time the pipeline's cost of service is reduced by an amount, it would go back into the rate phase, because at that point now, the pipeline's assets are, to that extent, funded by investment. There would be a negative surcharge imposed on rates for a period of, I want to say, about 12 years that would cover this rate case. Again, it's laid out in great detail from our economists. It would mimic, if you've seen in the record, the reverse South Georgia method. It would mimic that and provide simply a reduction in forward-looking rates rather than any sort of payback to anyone who paid the overfunded balance in the past. If there are no more questions, I'd like to reserve my last two minutes for rebuttal. Sure. If my colleagues have no further questions, we'll hear from Mr. Edinger again. Welcome back. Page 48 of the Commission's brief. We believe that, contrary to the shipper's view in this case, that the elaborate mechanism and proposal of the shipper is more indicative of – is more an indication that what they're seeking is retroactive and not appropriate. In the case, the analogy that the shippers make to analogizing the situation here to the change in tax rate, that is set out, as the Commission explained, in regulation. There is, therefore, notice of this mechanism when there is a tax change. You can see this in the Commission's regulations that apply to natural gas pipelines at 18 CFR 154.305. The Commission found that, while that's not directly applicable to the oil pipeline here, that the same principles apply to SFPP. The Commission described that in footnote 198 to paragraph 91 of the re-hearing order. That's at JA 1314. I do want to make absolutely clear, and I think the point has been made, but it needs to be clear that rates go into effect in this case in August 2008. Subsequent to that time, there will be no income tax allowance in the – in SFPP's rate. Today, what shippers are asking for is for the remand and for the Commission to make a finding that what was done prior to August 2008 was also problematic. I would submit that the Commission can't order refunds of pre-2008 rates without making a retroactive determination that those rates were not just and reasonable. The Commission in this case made three findings in support of its reasoning, and this is at paragraph 90 of the re-hearing order. The Commission found that the purpose of normalization is matching costs to benefits, and without the income tax allowance, it doesn't make sense to – there is no matching function, and it doesn't make sense to have added reduced rate base going forward. This is paragraph 91. The Commission moved on to the second reason, paragraph 92, and this is critical, that the rate payers have no equitable or ownership interest in the pre-2008 rate. In other words, added and deferred taxes and normalization is a process of matching costs and benefits. What the shippers paid prior to 2008, the shippers paid their properly allocated share of the cost, and they paid their properly – and they received their properly allocated share of the benefit. And this court's precedent in the public systems case from 1983 and the public utilities of California, Commission of California case from 1990, support that analysis. The Commission made this finding at paragraph 94 of the remand re-hearing order. That's at JA 1315. The Commission also – these principles also support the idea that deferred taxes aren't a loan from the rate payers to the – to SFPP. This money is always owed to the federal government. Finally, the Commission made the finding that the retroactive rate making in paragraph 93 and the Commission found, again, that refunds could not be allowed in this case without making a finding that the pre-2008 rates were not just and reasonable. So can I ask you this? This is just for you, Robin. So you just made a point about the money being held for the benefit of the federal government as opposed to the shippers. But on the other side of it, isn't it true that SFPP, for example, never had an expectation of holding onto the money? The – if – that's true, Your Honor. That's true. The SFPP would have expected to pay that to the federal government eventually. If Your Honor is getting at the point – presumptuous, but whether this then represents a windfall to the pipeline. There tends to be something kind of intuitively off about a situation in which there's a pool of money that's retained and the expectation that it would be disbursed for a future event, and then other considerations come into play to tell us that we don't have to worry about that future event. Well, then it's just a retention of money that was never expected to be retained to begin with. I would submit, Your Honor, first, that on some level, this is no different. Addit here isn't unique. This case could be about anything, that the United Airlines had found an error and remanded the commission to reevaluate. And we can all look at that situation and make arguments on whether the commission should be able to retroactively fix prior to 2008. The point is that the law doesn't allow that. And again, it gets back to the point that this isn't a windfall because these shippers – from the shippers' perspective, they paid their properly allocated costs and received the properly allocated benefit. And the commission addressed this point at Paragraph 94, and this is at JA 1315, and Paragraph 105 of Paragraph – and this is in the remand rehearing order – that's JA 1322. But I understand shippers – this is Deb Rogers – their basic point is there's no basis to impose on shippers the obligation to pay FTC a return on cost-free capital unless and until the 80s IT balance is amortized back to shippers. In other words, this is going into the base – is that just wrong? It is true that the rate base will increase. The commission made that finding, and that's at Paragraph 89, JA 1313. The problem with the argument, as I see it, Your Honor, again, is that the refunding of previously collected deferred taxes can't occur without a finding that there's been a flaw in pre-2008 rates. I understand your point, and your point is that absent some express provision in the statute, or maybe you will allow in the regulations, FERC has no other alternative? That's correct, Your Honor. Under retroactive rate-making principles, this is the right answer, and the commission did not have an alternative. The commission can't do what shippers ask it to do, can't refund the previously incurred income tax allowance, or the deferred portion at least, based on a finding that that's unjust and unreasonable. And you're clear it can't as opposed to won't? That's correct. Rate-making principles preclude the commission from ordering refunds of the deferred component of the income tax allowance prior to 2008. That's correct. And the commission makes this finding in Paragraph 93 at JA 1315. I may want to emphasize as well that the public utilities case, the commission in that found in Paragraph 95, again, in the rehearing order, this is at JA 1316, that that case supports the commission's analysis. And I think in our brief that we submitted to the court, we admitted, conceded that there are differences in that case, but the discussion of the principles and the discussion, importantly, the discussion in that case of the nature of the deferred taxes, and the idea that the state commission in that case had argued the rate payers could get those funds back because the entity was just a custodian of the funds for the rate payers, and that it would therefore be a windfall to El Paso to hold on to those deferred taxes. The court in that case rejected those arguments, and I think that's a powerful argument here in support of what the commission found. I also want to point out that the commission did address the shippers retroactive rate-making argument, and this is at Paragraph 101, 101 at JA 1319, and I would just submit that making refunds of deferred taxes and not making refunds of deferred taxes, those are mutually exclusive. And the commission, what the commission is saying here is that it made a very good, powerful case for why ordering the refunds would be retroactive rate-making, and it can't be the case that consistent accounting as the commission has ordered here results in a violation of retroactive rate-making. I think, unless your honors have any additional questions. Mr. Rettiger, thank you. Unless my colleagues have further questions, we'll, if Mr. Wagner has rebuttal. Thank you. I want to talk about a few things here. First, following up on Judge Rogers question about whether the commission has no choice and and the commission's counsel conceding that the commission believes itself bound and with by the CPC case that it has no authority to order relief here. I would point to the standard of review section in our initial brief that says that the court owes no deference to the commission's erroneous view of the law. So this is not a situation of arbitrary and capricious or or anything of that nature. This is the commission misinterpreting this court's law. Second, I want to go back to the concept of cost-free capital for a moment. And one of the important purposes, central purposes of ADA and tax normalization is to preclude a return on cost-free capital. And we use that term a lot, but what I mean by cost-free capital is this is a pipeline or a utility incurs a cost of capital to attract investment. It didn't have to attract investment to get this money. So the return that it's now getting is actually non-existent cost. So what FERC has done here is just allowed them a return on $28 million, which is an entirely fictitious cost. I'd also like to go back to the point about money owed to the federal government and who has a loan. Yes, the money is owed to the federal government. And then when it's not paid, as in the case of this situation or an asset sale in which the ADA remains overfunded after the taxes are accelerated, that balance stays on the books as a regulatory liability. And I would cite to the policy statement at 165 FERC, paragraphs 61, 115, paragraphs 35, 40, and 41 for that point. As to the regulation that the Commission Council cited, that doesn't apply to oil pipelines. I think that's an important difference. The Commission is free to develop policy and precedent however it chooses through regulations or through judicial or through the quasi-judicial precedent. The policy that we're talking about here is developed in case law, and we're entitled to a consistent application of it. As for the idea that we're arguing that the pipeline is just a custodian of the money and needs to refund it to us now, that's not what we're arguing. We're arguing that there are two things that can be done with that money. One, it can be used to pay taxes. Two, it can be used to reduce rates. That's what we have notice of. What we don't have notice of is what actually happened, which is that the pipeline kept the money and began earning a return on it when it didn't need to raise that money from investors. Lastly, I just want to say that all the analogies between SFPP and a pipeline whose tax rates are cut, there's no material difference here. What matters is that the reason for reconciliation applies equally to the SFPP as any other pipeline. It collected deferred taxes like any other pipeline in anticipation of spending the funds later. It had the same notice as any other pipeline that the balance was subject to reconciliation. It was subject to the same prohibition on collecting a return on cost-free capital. Just like any other pipeline with an overfunded balance, forecast jurisdiction over those rates. I see I'm out of time. My colleagues don't have any further questions. Thank you, Council, and thank you to all Council. We'll take this first case under submission.
judges: Srinivasan, Rogers, and Wilkins